SEYFARTH SHAW LLP
Edward V. Arnold, Esq. (pro hac vice application forthcoming)
earnold@seyfarth.com
Zachary F. Jacobson, Esq. (pro hac vice application forthcoming)
zjacobson@seyfarth.com
975 F Street, N.W.
Washington, DC 20004-1454
(202) 463-2400

Giovanna A. Ferrari, Esq. (pro hac vice application forthcoming)
gferrari@seyfarth.com
560 Mission Street, Suite 3100
San Francisco, California 94105-2930
(415) 544-1019

GALLAGHER & KENNEDY, P.A.
Donald Peder Johnsen (011545)
dpj@gknet.com
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Lockheed Martin Corporation, | ) | No. |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| General Dynamics Mission Systems, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

   Plaintiff Lockheed Martin Corporation ("Lockheed Martin"), by its

attorneys, for its Complaint alleges as follows:

-1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.   This is a case of contract repudiation.  General Dynamics Mission Systems, Inc. ("General Dynamics") is refusing to honor the pricing and terms it agreed to under Subcontract No. 4103957405 (the "Subcontract") with Lockheed Martin, forcing Lockheed Martin to seek judicial intervention.

2.   Lockheed Martin is the prime contractor for the United States Government's Global Positioning System IIIF ("GPS IIIF") program.  Under the GPS IIIF program, the Government purchases GPS satellites from Lockheed Martin over several years by exercising a series of contract options, which Lockheed Martin is obligated to perform once exercised.  In turn, Lockheed Martin exercises corresponding options under its subcontracts—such as the Subcontract with General Dynamics—to order equipment Lockheed Martin needs to build the GPS satellites.

3.   General Dynamics is a subcontractor to Lockheed Martin on the GPS IIIF program.  General Dynamics agreed with Lockheed Martin to a long-term pricing structure that allows Lockheed Martin to order General Dynamics's payload modules.

4.   In 2025, Lockheed Martin received an order from the Government for two GPS IIIF Space Vehicles ("SVs")[1] and Lockheed Martin notified General Dynamics that Lockheed Martin may exercise a purchase option under the Subcontract.

5.   General Dynamics responded by repudiating the Subcontract and demanding a nearly 60% price increase.

6.   Lockheed Martin brings this action to enforce the Subcontract.

**JURISDICTION, VENUE, AND CHOICE-OF-LAW**

7.   This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[1]    The correspondence between Lockheed Martin and General Dynamics uses the term "Satellite Vehicles," which is used interchangeably with Space Vehicles or SVs in the GPS IIIF program.

8.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant General Dynamics maintains a facility and personnel in this District and a substantial part of the events or omissions giving rise to the claims occurred here.

9.   The Subcontract contains a choice-of-law provision designating the laws of the State of New York and applicable federal common law as governing the interpretation and enforcement of the Subcontract.  This choice-of-law provision applies to both legal and equitable claims arising from or relating to the Subcontract.

## PARTIES

10. Plaintiff Lockheed Martin is a Maryland corporation with its principal place of business in located at 6801 Rockledge Drive, Bethesda, MD 20817.  Lockheed Martin develops technologically advanced and integrated products, services, and solutions through four primary lines of business: (a) Aeronautics, (b) Missiles and Fire Control, (c) Rotary and Mission Systems, and (d) Space.  Lockheed Martin is the U.S. Government's prime contractor for the GPS IIIF program and has performed its obligations under the Subcontract.

11. Defendant General Dynamics is a Delaware corporation with its principal place of business in Utah at 872 Heritage Park Blvd., Suite 230, Layton, Utah 84041.  General Dynamics operates a facility and maintains personnel at 8201 East McDowell Road, in Scottsdale, Arizona, from which General Dynamics performs its obligations under the Subcontract.  General Dynamics is a long-time subcontractor on the GPS IIIF program and has accepted the benefits of Lockheed Martin's orders and payments—until now.

## NATURE OF THE ACTION

### A.  Lockheed Martin and Lockheed Martin Space

12. Lockheed Martin Space ("Space") is one of the four major business divisions of Lockheed Martin.

13. Space is headquartered in Denver, Colorado.

14. Space develops, among other things, commercial and military satellites, space probes, and missile defense systems.

15. The GPS IIIF contract awarded to Lockheed Martin is under the purview of Space.

**B. GPS Satellite Blocks and the GPS IIIF Contract**

16. GPS satellite blocks are the various production generations of GPS used for satellite-based navigation.

17. The United States' GPS reached Full Operational Capability in 1995. Advances in technology and new demands on the existing system led to the effort to modernize the GPS system. In 2000, the United States Congress authorized the GPS Block III program ("GPS III") which consisted of GPS III SVs 1-10.

18. The GPS Block III Follow On ("GPS IIIF") program is the second block of GPS III satellites, consisting of SVs 11-32 that will be used to keep the GPS constellation operational for decades to come.

19. The United States Air Force contracted with Lockheed Martin to design, develop and manufacture all GPS IIIF SVs. The 22 GPS Block IIIF satellites are scheduled for launch between 2025 and 2034.

20. General Dynamics is a subcontractor to Lockheed Martin under the GPS IIIF contract, and is responsible for providing the Network Communications Element, including the UHF Crosslink and Tracking, Telemetry, and Command subsystems (collectively the "Payload"), which enable satellite-to-satellite and ground-to-space communications for the GPS IIIF satellites.

**C. The Dispute Before the Court**

21. This case concerns the refusal by General Dynamics to honor the pricing structure that it accepted, benefited from, and performed under as Lockheed Martin's subcontractor.

22. After Lockheed Martin received a Government order for two SVs and Lockheed Martin indicated to General Dynamics that Lockheed Martin might exercise its

1      options under the Subcontract, General Dynamics demanded a nearly 60% price increase,

2      erroneously claiming that it was not bound by the previously agreed contract pricing, and

3      attributing its demand for a price increase to Lockheed Martin not ordering General

4      Dynamics Payloads in the prior year.

5              23. Lockheed Martin seeks declaratory relief to enforce the parties'

6      agreement.

7              24. In the alternative to its contract-based claim, Lockheed Martin also

8      seeks equitable relief under New York law for promissory estoppel.  This claim arises

9      from General Dynamics's clear and repeated pricing commitments, which Lockheed

10     Martin relied upon to its detriment.

11                              **FACTUAL BACKGROUND**

12     **A.  The Subcontract and Pricing Structure**

13             25. On December 22, 2018, Lockheed Martin and General Dynamics

14     executed the Subcontract, a firm fixed-price and time-and-materials agreement for the

15     supply of Payloads and services in support of GPS IIIF.[2]

16             26. The Subcontract identifies the place of performance as General

17     Dynamics's facility at 8201 East McDowell Road in Scottsdale, Arizona.

18             27. The Subcontract includes a number of Exhibits containing additional

19     terms that were incorporated into the Subcontract by reference.

20             28. The Subcontract also includes an Order of Precedence clause, which

21     provides that in the event of any conflict between the Subcontract and the Exhibits, the

22     Subcontract shall control.

23             29. The Subcontract includes an Option Pricing table in the Subcontract's

24     Subsection 6.A, which provides fixed pricing tiers for the General Dynamics Payloads for

25     one, two, three, or four Payload buys in a given U.S. Government fiscal year ("GFY").[3]

26

27     [2] The Subcontract has been amended multiple times, most recently by Amendment 64, executed on August 20, 2025.

28     [3] In the most recent iteration of the Subcontract, as amended by Amendment 64, the Option Pricing table appears in the Subcontract's Subsection 10.A.

30. The Subcontract provides "Option Exercise Dates" that prescribe ordering windows for Lockheed Martin to exercise an option to place a Payload buy in any given GFY.

31. The Subcontract as originally executed did not include a Variation in Quantity ("VIQ") clause.

32. The Subcontract provided the full text of the Option Exercise clause in the Subcontract's Exhibit A, entitled "Document No. MS028, Rev. 3A (Major), Flowdowns for Prime Contract FA8807-18-C-0009, Global Positioning System (GPS) III Follow-on Production."

33. The Prime Contract Flowdowns include clauses from Lockheed Martin's prime contract that have been fully incorporated into the Subcontract, including the Option Exercise clause.

34. While the Option Exercise clause resembles the clause in Lockheed Martin's prime contract, Lockheed Martin and General Dynamics negotiated unique terms in the Subcontract's Option Exercise clause.

**B.  The Original Subcontract Option Exercise Clause**

35. The original Subcontract Option Exercise clause has four paragraphs that provide as follows:

36. "(a) Lockheed Martin, at a minimum, shall exercise the option year quantities exercised by the government.  Both parties will discuss the potential business opportunity of strategic buys made above the US Government authorized buy quantity."

37. "(b) In the event Lockheed Martin exercises an option, Lockheed Martin will update the affected sections of the Subcontract.  For example, Lockheed Martin will insert the unit price into the CLIN being exercised, insert the delivery date for that CLIN, and insert the accounting and appropriation data being obligated to procure that quantity for the item being procured.  The price at which Lockheed Martin will exercise these options will be based upon the unit prices specified in Section 2, subparagraph 8 Unexercised Options."

38. "(c) To ensure continuous uninterrupted production, CLINs must be exercised sequentially irrespective of what quantity is being procured by an option exercise modification.  Exercising a particular option quantity does not establish a precedent that Lockheed Martin will exercise options to procure that same quantity in any successive fiscal year."

39. "(d) In the event the Government does not place an order in a particular year, the offeror [General Dynamics] may be entitled to an equitable adjustment.  This equitable adjustment may only be applied towards the next fiscal year's order.  **All subsequent pricing shall remain valid and unchanged**." (emphasis added)

40. Paragraph (d) of the Option Exercise clause, negotiated and agreed to by the parties, reflected their mutual understanding that 1) it was possible, and indeed foreseeable, that the Government might not exercise prime contract options every year (a "Zero Buy"); and 2) pricing for future years would remain "valid and unchanged" following a Zero Buy.

41. The Option Exercise clause does not state that Lockheed Martin must exercise an option every year.  Nor does it state that Lockheed Martin's decision to not place an order in any one year will render future pricing null and void.

42. The Parties also recognized that a Zero Buy "may" have an impact on pricing assumptions for the following year(s) and provided a mechanism for General Dynamics to seek compensation for those impacts through an equitable adjustment.

43. The Subcontract incorporated Defense Federal Acquisition Regulation Supplement ("DFARS") clause 252.243-7002, Requests for Equitable Adjustment, as a mechanism for General Dynamics to submit its request for an equitable adjustment following a Zero Buy.

C. **The 2020 Amended Option Exercise Clause & Adoption Of The VIQ Clause**

a. **The Option Exercise Clause**

44. In 2020, General Dynamics and Lockheed Martin entered into a "Strategic Buy" agreement whereby Lockheed Martin purchased four Payloads from

-7-

General Dynamics even though that year the Government only exercised options for two satellites from Lockheed Martin.  By agreeing to the Strategic Buy, General Dynamics received the benefit of accelerated sales, and Lockheed Martin received the benefit of having on-hand spare Payloads and a volume discount.  The Strategic Buy required Lockheed Martin to advance funding to General Dynamics at Lockheed Martin's own risk, because if the Government decided not to purchase additional satellites, Lockheed Martin would not recover its costs for the extra Payloads it had purchased.

45. As part of the Strategic Buy, Lockheed Martin and General Dynamics renegotiated the Subcontract's Option Exercise clause and adopted the VIQ table.  The amended Option Exercise clause reads as follows:

46. "(a) Lockheed Martin, at a minimum, shall exercise the option year quantities exercised by the government.  Both parties will discuss the potential business opportunity of strategic buys made in advance of Government authorized buy quantity."

47. "(b) In the event Lockheed Martin exercises an option, Lockheed Martin will update the affected sections of the subcontract.  For example, Lockheed Martin will insert the unit price into the CLIN being exercised, insert the delivery date for that CLIN, and insert the accounting and appropriation data being obligated to procure that quantity for the item being procured.  The price at which Lockheed Martin will exercise these options will be based upon the unit prices specified in Section 2, subparagraph 8 Unexercised Options.  In the event Lockheed Martin procures in advance of Government authorized buys, they shall be funded accordingly."

48. "(c) To ensure continuous uninterrupted production, CLINs must be exercised sequentially irrespective of what quantity is being procured by an option exercise modification.  Exercising a particular option quantity does not establish a precedent that Lockheed Martin will exercise options to procure that same quantity in any successive fiscal year."

49. "(d) In the event both Parties enter into a strategic buy made in advance of the Government authorized buys, the offeror may not be entitled to an equitable

adjustment. **All subsequent pricing shall remain valid and unchanged.**" (emphasis added)

### b. The VIQ Clause

50. On October 28, 2020, the parties executed Amendment 04 to Firm-Fixed Price and Time and Materials Definitive Contract, which included limited option pricing for two- and three-Payload buys in certain fiscal years and left Section 2.11 (Variation in Quantity) reserved. Specifically, Amendment 04's pricing table provided only partial coverage for GFYs 2020–2025 and did not include one-Payload or four-Payload buy options. The original priced option quantities mirrored the Government's prime contract anticipated SV buying schedule, but the parties always knew that the Government might, and indeed likely would, deviate from that schedule over the course of the program. Amendment 04 did not include a VIQ clause.

51. Less than three weeks later, on November 16, 2020, the parties executed Amendment 05, which included a comprehensive pricing structure covering one-, two-, three-, and four-Payload buys across GFYs 2020 through 2028, and included a VIQ clause. The VIQ clause states, in its entirety, the following:

> Lockheed Martin may exercise an option year in the quantity and at the price specified in table 2.11.A. Lockheed Martin may exercise the option by written notice to the Seller in accordance with the table in 2.11.B. In order to realize the price break quantity buy offered, all orders must be placed in sequential order and no more than once annually at the time of the option exercise. The Option Year price Lockheed Martin will pay the Seller to deliver an SV depends upon the quantity of SVs Lockheed Martin procures and the fiscal year date Lockheed Martin exercises the SV option(s).

52. Amendment 05 was negotiated as part of the parties' Strategic Buy arrangement, under which Lockheed Martin advanced funding to General Dynamics to maintain continuous production and secure volume pricing benefits.

53. These changes reflected the parties' effort to formalize the Strategic Buy arrangement and provide a more detailed pricing framework for future orders, not to impose a forfeiture of pricing rights against Lockheed Martin for skipping a year.

54. The addition of the VIQ clause did not alter the parties' longstanding understanding—reflected in the Subcontract Option Exercise clause and contemporaneous correspondence—that pricing would remain valid and unchanged despite a Zero Buy year.

55. As General Dynamics and Lockheed Martin finalized negotiations of the language in the VIQ table and the Option Exercise clause, General Dynamics acknowledged, in Contract Letter 511023-035d/20, on September 17, 2020, that "[b]ased on the above agreements to enter into a potential strategic buy, it is understood that [Lockheed Martin] may not place an order on an annual basis…"

56. General Dynamics's written acknowledgement on September 17, 2020 is consistent with the original language in paragraph (d) of the Option Exercise clause that existed before Amendment 05 to the Subcontract, and the parties' continuing understanding of the nature of a Zero Buy.

57. General Dynamics further confirmed in an email sent on September 29, 2020, with respect to the amendments to Option Exercise clause (d),

> [W]e believe the intent of your [change to (d)] is for GDMS to confirm that we will not seek equitable adjustment if LM does not order the amount of Space Vehicles the Government orders due to LM already having the required quantity on order from a previous years' strategic buy.  GDMS confirms we will not request an equitable adjustment if this becomes the case.

58. The VIQ clause states, in pertinent part: "In order to realize the price break quantity buy offered, all orders must be [1] **placed in sequential order** and [2] **no more than once annually** at the time of the option exercise" (brackets and emphasis added). The term "sequential order" refers to the numerical sequence of Payload orders, not to uninterrupted annual ordering. Notably, the parties did not agree that Lockheed Martin must place an order "no less than once annually."

59. The Subcontract does not require Lockheed Martin to place orders every fiscal year, nor does it condition the validity of future VIQ pricing on uninterrupted annual ordering.  Instead, the Subcontract permits Lockheed Martin to exercise options

-10-

for Payloads in numerical sequence (*e.g.*, SV21, SV22, SV23, etc.) priced in accordance with the agreed-upon pricing in the prescribed Option Pricing table ordering windows, regardless of whether a Payload order was placed in the prior year.

60. At no time did the parties ever negotiate or contemplate that Lockheed Martin not placing an order in any one year—either because of the Government making a Zero Buy or as an impact from a Strategic Buy—would vitiate the remainder of the VIQ Option Pricing table. To the contrary, the parties provided General Dynamics with a mechanism (the request for equitable adjustment) to recover cost growth it incurred as a result of a Zero Buy and repeatedly reaffirmed that "all subsequent pricing shall remain valid and be unchanged."

61. If, as General Dynamics now argues, subsequent VIQ pricing is no longer valid because Lockheed Martin did not place an order in GFY2024, there would have been no need for the equitable adjustment process in the Subcontract—General Dynamics would simply reprice the contract (which is exactly what it is trying to do now to increase its price by nearly 60%).

62. And, had the parties intended that Lockheed Martin not placing an order in any given year would eliminate the VIQ pricing for future options, a dramatic and impactful consequence, the parties would have explicitly written that into the Subcontract. But as shown above, the parties did exactly the opposite—continually discussing equitable adjustments (when they would or would not be available following a Government Zero Buy), reaffirming the continuing validity of the VIQ table, and not adding any such language to the Subcontract.

**D. The Parties' Ordering History**

63. From 2018 through 2023, General Dynamics accepted and performed under multi-vehicle orders placed by Lockheed Martin pursuant to the VIQ pricing structure.

-11-

64. The Government ordered two SVs (SV11-12) from Lockheed Martin in GFY 2018-2019 (the prime contract's "Base Period"), and Lockheed Martin and General Dynamics executed a two Payload buy (SV11-12).

65. The Government ordered two SVs (SV13-14) from Lockheed Martin in GFY 2020-2021 (the prime contract's "First Option Period"), and Lockheed Martin and General Dynamics executed **a four Payload Strategic Buy** (SV13-16).

66. The Government ordered three SVs (SV15-17) from Lockheed Martin in GFY 2022 (the prime contract's "Second Option Period"), and Lockheed Martin and General Dynamics executed a three Payload buy (SV17-19).

67. The Government ordered three SVs (SV18-20) from Lockheed Martin in GFY 2023 (the prime contract's "Third Option Period"), and Lockheed Martin and General Dynamics executed a three Payload buy (SV20-22).

68. The Government did not order SVs from Lockheed Martin in GFY 2024, **the Zero Buy** (the prime contract's "Fourth Option Period"), and Lockheed Martin and General Dynamics did not execute a Payload buy.

69. The Government ordered two SVs (SV21-22) from Lockheed Martin in GFY 2025 (the prime contract's "Fifth Option Period").

**E.  Lockheed Martin's Notice of Intent to Exercise Its Option to Execute a Two Payload Buy for GFY 2025**

70. On May 30, 2025, Lockheed Martin notified General Dynamics that it received a GFY 2025 Government order for two SVs and intended to exercise the corresponding options under the Subcontract for a two Payload buy at GFY 2025 pricing.

71. Lockheed Martin requested General Dynamics's concurrence and asked General Dynamics to identify any allowable cost impacts from the gap in government award timing (*i.e.*, the Zero Buy) by June 30, 2025.

72. On June 3, 2025, General Dynamics responded in writing, stating that that it considered the VIQ Option Pricing table no longer applicable due to Lockheed Martin not exercising an option under the Subcontract to execute a Payload buy in GFY 2024.

-12-

73. In support of its position, General Dynamics cited the VIQ clause of the Subcontract, asserting that the pricing discounts were contingent on Lockheed Martin exercising options annually.

74. As a result, General Dynamics claimed that only single-unit pricing remained available for future orders.

**F.  General Dynamics's Explicit Repudiation of the Subcontract**

75. On June 4, 2025, Lockheed Martin replied, disputing General Dynamics's interpretation, and reaffirming that the Subcontract preserved the agreed pricing structure despite no option exercised for GFY 2024.

76. On June 11, 2025, General Dynamics reiterated its position, stating that "the price break quantity agreed to and reflected in the Variation in Quantity (VIQ) table is no longer in effect for any further ordering."

77. On July 2, 2025, Lockheed Martin responded, noting that General Dynamics had not submitted any allowable cost impacts resulting from the gap in Government award timing by the requested June 30, 2025, deadline, and that Lockheed Martin interpreted General Dynamics's silence as a waiver of any entitlement to an equitable adjustment for production impacts not already covered by Lockheed Martin's Strategic Buy.

78. Lockheed Martin requested General Dynamics's concurrence with this interpretation or, alternatively, submission of the requested impact data in support of an equitable adjustment by July 7, 2025.

79. On July 3, 2025, General Dynamics acknowledged receipt of Lockheed Martin's July 2, 2025, letter by email.

80. General Dynamics reiterated its position that Lockheed Martin failed to order in sequence, and that, as a result, the prices in the VIQ table were no longer valid and the Strategic Buy provisions were also inapplicable.

81. Even though Lockheed Martin repeatedly asked General Dynamics for cost impact data to support an equitable adjustment for production impacts resulting from

1    the gap in Government award timing, General Dynamics did not, and has not, submitted

2    any cost impact data to Lockheed Martin.

3              82. General Dynamics's June 3 and June 11 letters and July 3 email

4    constitute an unequivocal refusal to perform under the agreed pricing terms.

5              83. Rather than submit an equitable adjustment (which would require it to

6    document and certify its cost growth is a result of not receiving an order in 2024) General

7    Dynamics has unilaterally demanded nearly 60% more than the contracted-for price.

8              84. At no point has General Dynamics explained why the Option Exercise

9    clause's commitment to hold "all subsequent pricing" is not applicable to this situation.

10   Instead, General Dynamics has relied on one word, "sequential," in the VIQ section of

11   the Subcontract to argue that its obligations are gone—and ignores the fact that it has

12   always known that Zero Buys are a practical risk and reality on the GPS IIIF program.

13   **G. Lockheed Martin's Performance and Actual Injury**

14             85. Lockheed Martin has performed all its obligations under the Subcontract

15   and has not waived any rights.

16             86. As a direct result of the four Payload Strategic Buy in the First Option

17   Period – two Payloads in support of the Government's order for SV13-14 and two

18   Payloads in anticipation of future Government orders – Lockheed Martin, at its own

19   expense and risk that the Government would not purchase additional SVs, gained a price

20   savings on the Payloads for SV15 and SV16.

21             87. General Dynamics accepted this funding from Lockheed Martin and

22   continued performance without objection.

23             88. As a result of the Strategic Buy, General Dynamics and Lockheed

24   Martin remained two Payloads ahead of Government SV orders through the GFY 2025

25   order for SV21-22 and will remain ahead if Lockheed Martin decides to exercise an

26   option for a Payload buy in GFY 2025.  In light of General Dynamics's repudiation of the

27   Subcontract, and without certainty as to the applicable pricing under the Subcontract,

28   Lockheed Martin cannot determine whether to place a Payload order at this time.

-14-

89. As a result of remaining two Payloads ahead of Government orders, General Dynamics has maintained continuous Payload production notwithstanding the Zero Buy in GFY 2024.

90. By maintaining continuous production, General Dynamics received the benefit of avoiding additional costs associated with stopping and restarting Payload production lines, and therefore has no allowable cost impacts from the gap in Government award timing in GFY 2024.

91. Had General Dynamics experienced cost impacts, General Dynamics could have provided that cost impact data to Lockheed Martin in support of a request for an equitable adjustment; however, General Dynamics has refused to provide any cost data, which confirms that General Dynamics avoided cost impacts from the gap in Government award timing due to Lockheed Martin funding General Dynamics's continuous production through the Strategic Buy.

92. General Dynamics received this benefit as a direct result of the Subcontract's Option Exercise clause, which permits Strategic Buys at Lockheed Martin's expense in advance of Government orders.

93. After receiving the benefits from Lockheed Martin's Strategic Buy, General Dynamics informed Lockheed Martin that "the 'strategic buy' provisions are inapplicable to the current issue, LM failed to place its orders sequentially, and the price breaks in the VIQ table are no longer valid going forward."

## PLAINTIFF'S CAUSES OF ACTION

94. The following causes of action arise from General Dynamic's unjustified attempt to impose inflated pricing terms. Lockheed Martin seeks declaratory relief and restitution.

## FIRST CAUSE OF ACTION

### (Against General Dynamics – Declaratory Judgment (28 U.S.C. §§ 2201–2202))

95. Plaintiff repeats, realleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

96. Under 28 U.S.C. § 2201, a federal court may declare the rights and legal relations of parties to a contract where an actual controversy exists.

97. An actual, present, and justiciable controversy exists between Lockheed Martin and General Dynamics concerning their respective rights and obligations under the Subcontract.

98. Lockheed Martin contends that the Subcontract entitles it to purchase two Payloads at the agreed two-unit price for GFY 2025, and that the pricing structure remains valid and enforceable notwithstanding the absence of a Payload buy in GFY 2024.

99. General Dynamics has taken the position that the VIQ pricing structure is "no longer in effect" and that only single-unit pricing remains available.

100. General Dynamics's position has created uncertainty and instability in Lockheed Martin's performance under its prime contract with the Government, including its ability to meet cost and schedule commitments.

101. Declaratory relief is appropriate where, as here, a party's contractual rights are disputed and immediate clarification is necessary to avoid further harm, including disruption to performance under a related Government contract.

102. Lockheed Martin's cause of action is ripe for adjudication because General Dynamics has unequivocally repudiated its contractual obligations by asserting that the VIQ pricing structure is no longer in effect and by demanding a nearly 60% price increase.

103. This dispute is neither hypothetical nor contingent on future events; it presents an actual, present controversy that directly impacts Lockheed Martin's ability to perform under its prime contract with the United States Government.

104. Lockheed Martin cannot responsibly issue a purchase order without clarity on the applicable pricing, and the uncertainty created by General Dynamics's position threatens Lockheed Martin's cost, schedule, and compliance obligations.

105.    Immediate judicial intervention is necessary to resolve this live controversy and prevent further harm.

106.    Pursuant to 28 U.S.C. § 2201, Lockheed Martin seeks a judicial declaration that:

107.    The Subcontract's VIQ pricing structure remains valid and enforceable;

108.    Lockheed Martin is entitled to purchase two Payloads at the agreed two-unit price;

109.    General Dynamics's refusal to honor that pricing constitutes a breach of the Subcontract; and

110.    General Dynamics is not entitled to impose single-unit pricing or otherwise alter the agreed pricing structure.

111.    A declaratory judgment will serve the useful purpose of clarifying and settling the legal relations between the parties and will terminate the uncertainty giving rise to this proceeding.

## **SECOND CAUSE OF ACTION**

### **(Against General Dynamics – Promissory Estoppel (Pled in the Alternative))**

112.    Plaintiff repeats, realleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

113.    This claim is pled in the alternative to Count I and is asserted only in the event the Court determines that no enforceable contract governs the subject matter of the dispute.

114.    Under New York law, a claim for promissory estoppel requires:

    a.  A clear and unambiguous promise;

    b.  Reasonable and foreseeable reliance on the promise; and

    c.  An actual injury suffered as a result of the reliance.

115.    Over the course of their multi-year relationship under the Subcontract, General Dynamics made clear and repeated promises to Lockheed Martin

regarding fixed pricing for multi-Payload buys, as reflected in the VIQ Option Pricing table, the original Option Exercise clause, and General Dynamics's performance and correspondence.

116.    Before the parties executed Amendment 05 to the Subcontract, the fourth paragraph of the Option Exercise clause stated in its entirety that "In the event the Government does not place an order in a particular year, the offeror may be entitled to an equitable adjustment.  This equitable adjustment may only be applied towards the next fiscal year's order.  All subsequent pricing shall remain valid and unchanged."

117.    General Dynamics expressly acknowledged in writing that Lockheed Martin may not make a Payload buy each year, stating on September 17, 2020, when the parties adopted the current version of the fourth paragraph of the Option Exercise clause addressing strategic buys, that "based on the above agreements to enter into a potential strategic buy, it is understood that [Lockheed Martin] may not place an order on an annual basis…" and that "all subsequent pricing shall remain valid and unchanged."

118.    General Dynamics knew or should have known that Lockheed Martin would rely on those pricing commitments in planning and executing its obligations under its prime contract with the Government.

119.    Lockheed Martin reasonably and foreseeably relied on General Dynamics's pricing promises by:

120.    Structuring its Government proposals and internal budgets around the agreed VIQ pricing;

121.    Advancing funds to General Dynamics through a Strategic Buy to support uninterrupted production through GFY 2025;

122.    Forgoing alternative sourcing or pricing strategies based on the expectation that General Dynamics would honor the agreed pricing for GFY 2025; and

123.    Making strategic procurement decisions to align with the pricing tiers General Dynamics had committed to.

124.    Lockheed Martin's reliance was substantial and detrimental. General Dynamics's repudiation of the agreed pricing has exposed Lockheed Martin to a nearly 60% cost increase, disrupted its production schedule, and created risk of noncompliance with its Government obligations.

125.    General Dynamics accepted and retained the benefits of Lockheed Martin's reliance, including early funding, uninterrupted production, and favorable positioning on a high-profile national security program.

126.    Injustice can only be avoided by enforcing General Dynamic's pricing promises. Lockheed Martin is therefore entitled to relief under the doctrine of promissory estoppel, including damages or restitution in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lockheed Martin Corporation respectfully requests that the Court enter judgment in its favor and against Defendant General Dynamics Mission Systems, Inc., and award the following relief:

A.    Declaratory judgment that the pricing terms set forth in the Subcontract, including the VIQ Option Pricing table, remain valid and enforceable;

B.    Declaratory judgment that Lockheed Martin is entitled to purchase two Payloads at the agreed two-unit price set forth in the Subcontract for GFY 2025;

C.    Specific performance requiring General Dynamics to honor the agreed pricing terms under the Subcontract, including the VIQ Option Pricing table, and to perform its obligations for the two Payload orders at the two-unit price set forth in the Subcontract for GFY 2025;

D.    Damages in an amount to be proven at trial, including but not limited to restitution or disgorgement of benefits wrongfully retained by General Dynamics, as sought under the theory of promissory estoppel, in the alternative to Lockheed Martin's contract-based claim;

E.    Attorneys' fees and costs as permitted by law or equity, including pursuant to A.R.S. § 12-341.01 and LRCiv 54.2; and

1          F.        Any other relief as the Court deems just and proper.

2                              DATED this 22nd day of August, 2025.

3                                                     GALLAGHER & KENNEDY, P.A.

4                                                     By: /s/ Donald Peder Johnsen

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-20-